STATE EX REL. NIEWOEHNER, APPELLANT, *v.*
BOTTOMLY, RESPONDENT.

(No. 8474.)

(Submitted January 4, 1944. Decided April 27, 1944.)

[148 Pac. (2d) 545.]

*Mr. George Niewoehner, Messrs. Rockwood Brown* and *Horace S. Davis* and *Mr. Franklin S. Longan,* for Appellant, submitted a brief; *Mr. Niewoehner* and *Mr. Davis* argued the cause orally.

*Messrs. Ralph J. Anderson, Fred Lay, Clarence Hanley, George S. Smith, Alfred F. Dougherty, Charles L. O'Donnell, Jr., Myles J. Thomas, John W. Chapman* and *Robert L. Word, Jr.,* for Respondent, submitted a brief; *Mr. Anderson* and *Mr. Smith* argued the cause orally.

MR. JUSTICE ANDERSON delivered the opinion of the court.

This is a proceeding in *quo warranto* to determine the right to the office of Attorney General. Respondent holds the office by appointment made by the Governor under Chapter 47, Laws of 1941, a war emergency measure. Relator claims the office by election, having received all the votes cast for Attorney General at the general election in 1942. Judgment in the lower court was for respondent and the relator has appealed.

The office of Attorney General is provided for in the State Constitution, to be filled by election for a term of four years. Also, the Constitution, Article VII, section 7, provides that if the office is ''vacated by death, resignation or otherwise, it shall be the duty of the governor to fill the same by appointment,

and the appointee shall hold his office until his successor shall be elected and qualified.''

At the general election held on November 5, 1940, John W. ▮▮▮ Bonner was elected to the office of Attorney General for the regular four-year term to commence on the first Monday of January, 1941. Bonner duly qualified and on the first year of said term took office and entered upon the discharge of the duties thereof. Prior to his election, Bonner was a member of the Officers Reserve Corps, and on April 20, 1942, he was ordered to report in ten days at Washington, D. C., for active military service. Bonner immediately gave written notice to the Governor of the orders which he had received, and thereupon the Governor, acting under the authority of Chapter 47, supra, appointed Howard M. Gullickson to function as Attorney General during Bonner's absence in active military service. Howard M. Gullickson accepted the appointment, qualified for and took office on May 1, 1942.

On June 6, 1942, this court decided the case of *Gullickson* v. *Mitchell,* 113 Mont. 359, 126 Pac. (2d) 1106, wherein the relator George Niewoehner appeared as *amicus curiae,* submitted an original and a supplemental brief and argued the cause orally. The case was decided contrary to Niewoehner's contentions, and we held that the induction of Bonner into the active military service of the United States did not vacate the office of Attorney General.

Four days after the above case was decided, to-wit: On June 10, 1942, the relator herein, George Niewoehner, attempted to have his name placed upon the ballots for nomination to the office of Attorney General and in that connection he tendered to the Secretary of State of the state of Montana a nominating petition for such office together with the statutory filing fee, contending that the appointee Howard M. Gullickson could not hold the office past the 1942 general election unless chosen by the people at such election.

The Secretary of State declined to accept or file Niewoehner's nominating petition and refused the tendered filing fee. There-

upon Niewoehner, on June 12, 1942, filed in this court a petition seeking a writ of mandate to compel the Secretary of State to accept his nominating petition and to place his name on the ballots as candidate for the office of Attorney General at the 1942 primary election. (See *State ex rel. Niewoehner* v. *Mitchell*, 113 Mont. 617, 139 Pac. (2d) 545.) The matter was presented to, and argued before, this court on June 13, 1942, and thereafter, and on June 16, 1942, the petition for the writ of mandate was denied.

On June 18, 1942, the relator Niewoehner filed in this court in said cause a petition for rehearing, which petition this court on June 19, 1942, ordered stricken from the files.

Howard M. Gullickson discharged the duties of the office of Attorney General continuously from May 1, 1942, to August 3, 1942, on which latter date he too entered into the active military service of the United States. Thereupon the Governor appointed the respondent R. V. Bottomly to function as Attorney General during Bonner's continued absence on active military duty.

On August 3, 1942, R. V. Bottomly accepted the appointment, qualified for the office and has since continuously discharged the duties of the office of Attorney General.

The printed official ballots used in connection with the general election held on November 3, 1942, contained no nominees for the office of Attorney General nor was any provision made on such ballots for voting for an Attorney General. No election proclamation had been issued in connection with the filling of such office. Notwithstanding, the relator Niewoehner in the present action represents that at such general election held on November 3, 1942, he received 124 votes for the office of Attorney General, they being the only votes cast for that office, and that such votes were all by writing in relator's name for such office on the ballots used at such election. By reason of the foregoing, the relator George Niewoehner claims that he was elected and that his right to the office is superior to that of the Governor's appointee, R. V. Bottomly.

As before stated, Bonner was elected to the office of Attorney

General of this state for a full four-year term commencing with the first Monday of January, 1941, and to end with the first Monday of January, 1945. The United States called him into active military service on May 1, 1942, in connection with the present war emergency and he has since continued in such active military service. In the Gullickson case, supra, we held that such active military service did not vacate the office of Attorney General and in line with such holding the court denied the petition of the relator Niewoehner for a writ of mandate in Cause No. 8340 herein. The Gullickson decision still stands. Hence in the instant action the district court correctly found the issues in favor of the respondent R. V. Bottomly and against the relator George Niewoehner and we so hold.

It is of interest to note that the *Gullickson Case* has been referred to approvingly in a number of other jurisdictions, as in the following cases: *People* v. *Sischo,* Cal. Sup., 144 Pac. (2d) 785; *Critchlow* v. *Monson,* 102 Utah 378, 131 Pac. (2d) 794; *State* v. *Wysong,* W. Va., 24 S. E. (2d) 463; *Baker* v. *Dixon,* 295 Ky. 279, 174 S. W. (2d) 410.

In all this series of litigation, the uppermost question has been whether a special election would need to be held or whether the office could be taken care of by appointment as Chapter 47 provides. The adjudications already made have settled that question, sustaining the law as constitutionally sound and workable. Upon the basis thereof the office of Attorney General has been, and is being, carried on. A contrary ruling now would unsettle all that has been done except as it might be considered valid as *de facto* government. As the question is now raised, it reaches into the whole arrangement adopted under that decision for the functioning of the office during Bonner's absence. The rule as therein announced must be held to control in the instant case if the law is to serve the purpose intended. Appointments of persons to act during the absence of the regular incumbents in the military service have been made, not only in that case but in many others involving various offices throughout the state, in conformity with that decision. It has been

accepted as the law by the various governmental offices, departments and employees, as well as by the people of the state generally.

Relator reiterates his contention as in his earlier cases that an appointment, regardless of its relation to the rights of the regularly elected incumbent, cannot extend beyond the time of a general election; that the people then must have the right to select one for the temporary functioning of the office. The Bottomly appointment, it is contended, could therefore not extend beyond the time of the general election in 1942.

The purpose of the law is to make provision for the full functioning of the office without an election during the absence of the regular incumbent while in military service, and so that his right to the office will be preserved and that he may resume it upon his return. Under Chapter 47 it is the duty of the Governor to keep the office filled by appointment during such absence. If one so appointed does not accept, the Governor must appoint another. If an appointee leaves the office, it again becomes the duty of the Governor to make an appointment. Only in that way will the functions of the office be performed without interruption and without loss of the office to the regular incumbent as the law intends. Gullickson's entry into the military service left the office in the same situation as at the time of his appointment. To carry out the purpose of the law, it then became obligatory for the Governor to select another.

A number of law questions have been raised by counsel which, under our view of the case as already expressed, it is not necessary to discuss.

Bottomly holds the office by right of appointment made according to law. There was no election to the office to be made in 1942, and the votes cast for the relator at the general election that year did not result in an election. The relator is therefore without right to claim the office.

The judgment of the lower court dismissing his petition is affirmed.

Mr. Chief Justice Johnson concurs.

ASSOCIATE JUSTICES ERICKSON and ADAIR concurring specially:

We cannot hold with relator's contention that a total of 124 votes cast out of a possible 200,000 or more effected the election of relator to the important office of Attorney General of Montana, and, since relator, in his oral argument in this cause, expressly accepted the court's holding in the case of *Gullickson* v. *Mitchell,* supra, as the law, it follows that he has failed to show himself entitled to the relief here sought. For these reasons we concur in affirming the judgment of the district court.

MR. JUSTICE MORRIS:

I dissent on the ground that the majority opinion does not clearly present the matter in controversy. George Niewoehner was one of counsel in the case of *Gullickson* v. *Mitchell,* 113 Mont. 359, 126 Pac. (2d) 1106. On the determination of that action by a judgment contrary to Mr. Niewoehner's views he attempted to file as a candidate for Attorney General at the next general election, but his right to do so was denied by the Secretary of State. Thereupon he was instrumental in having "sticker" votes cast for himself to the number of 124, and being the only person to receive any votes for that office at such election he commenced this action to oust the incumbent. The action was tried in the First Judicial District in and for Lewis and Clark county with the Honorable Frank P. Leiper of the Seventh Judicial District presiding.

Judge Leiper found for the defendant on the ground that the proclamation issued by the Governor in accordance with the provisions of sections 534 and 536, Revised Codes, giving notice of the general election to be held November 3, 1942, made no reference to the election of an Attorney General, and that in accordance with the rule laid down by this court in *State ex rel. Patterson* v. *Lentz,* 50 Mont. 322, 343, 146 Pac. 932, such notice in the proclamation was a condition precedent to a valid election. I agree with Judge Leiper as to the binding effect of the foregoing rule, but do not deem myself bound to concur with him in the final conclusion of his opinion, and he makes it clear that

he accepts the rule applied in *Gullickson* v. *Mitchell*, supra, only out of deference for the rule of *stare decisis.*

Judge Leiper's conclusions of law show such diligent research and profound grasp of the questions of constitutional law involved that, in order to preserve the fruits of his labors for future use, should the occasion arise, such conclusions are made a part of this dissent:

"Conclusion of Law Number II.

"Since no notice was given to the electors of this state that an election would be held on November 3, 1942, to fill the office of Attorney General, no election to fill that office was held; and, therefore, the relator was not elected to that office and judgment must be entered dismissing relator's petition.

"A proper regard for the obligations of the oath assumed by the judge of this court, coupled with the fact that the principles here involved go to the very roots of representative government, require that the reasons for this court's conclusions hereinafter stated be herein set forth.

"By cross-complaint the defendant seeks affirmative relief in that he claims the right to represent the people of this state as attorney general. But there is involved not only the right of the defendant to serve the people, but as well, and of much greater importance, the fundamental right of the people of this state to be served by a person chosen by themselves in preference to one put into the office by the appointing power to meet a temporary emergency. By the application of the law to the facts, the measure of the relief to which defendant is entitled, if any, must be determined.

"The facts are simple and undisputed. John W. Bonner testified by deposition at the trial of this cause. That deposition was taken on January 19, 1943. He was elected for the term beginning on the first Monday of January, 1941, and ending on the first Monday of January, 1945, qualified, and served as Attorney General until May 1, 1942. He then entered the military service of the United States, went to Washington, D. C., was commissioned a major, and later advanced to the position of

lieutenant colonel, which position he now holds. He now is within the State of Oregon. He has been away from the State of Montana since his entry into the military service and expects to remain in the military service for the duration of this war. Since May 1, 1942, he has not performed any part of the duties of Attorney General and he does not expect to perform any part of such duties for the duration of this war. He has not been discharged from such service.

"The defendant was appointed by the Governor of this state to the office of Attorney General and duly assumed the duties of that office on August 3, 1942. Defendant asserts that he is entitled to hold this office until defendant's successor shall be elected and qualified unless John W. Bonner shall have completed his military service and shall return and claim the office before that time, all as provided by Chapter 47, Laws of 1941, and seeks judgment accordingly.

"The defendant's claim is supported by the provisions of Chapter 47. The question presented, therefore, is whether the provisions of Chapter 47 conflict with the applicable provisions of our Constitution. The determination of that question requires an analysis of Chapter 47, together with an analysis of the applicable provisions of the Constitution and a comparison of the provisions of the one with the other.

"Before proceeding with that analysis and comparison, it is well to note that our state 'Constitution is not only the direct and basic expression of the sovereign will, but is the absolute rule of action and decision for all departments and officers of government in respect *to all matters covered by it, and must control as it is written until it shall be changed by the authority* that established it.' The Constitution of this state 'so far as it is consistent with the provisions of the federal Constitution, is the fundamental law of the state, is part of its supreme law, *and Acts passed by the legislature inconsistent therewith are invalid.*' It is likewise binding on every citizen. (6 R. C. L., p. 40.)

"The purpose which the legislature had in mind in the enactment of Chapter 47 is apparent, namely: That every elected

officer within the State of Montana (and others employed by the state but which it is not here necessary to consider), if he enters the military service of the United States, may reenter the office to which he was elected upon his return from such military service, provided certain conditions enumerated in Chapter 47 are met. That purpose is most commendable. In fact, if it were possible, the same principle might well be applied so that every man or women within this state, whether an office holder or not, who leaves a job and enters the military service of the United States would, upon his or her return, have the right to resume that same job.

"However commendable the purpose of the legislature may be, if the provisions of the statute impinge upon those of the Constitution, then the statute must fall.

"Is it not apparent that the primary reason for the enactment of Chapter 47 is the present World War? But is it not true that this Constitution of ours remains the same whether we're at war or whether we're enjoying peace? Courts throughout this land have so declared. I shall advert to but two of these decisions.

"The Supreme Court of the United States, in the case of *Ex parte Milligan* [4 Wall. 2, 120] 18 L. Ed. 281, had under consideration an application for a writ of habeas corpus. Milligan was arrested on October 5, 1864, by the military authorities, tried before a military commission, and sentenced to be hanged. It will be noted that the facts out of which this case grew arose during our Civil War. Roughly stated, the question presented was whether the defendant was entitled to a jury trial as provided in the Constitution, or whether his conviction by the military court amounted to an invasion of the provisions of the Constitution. The court there said:

" 'Time has proven the discernment of our ancestors; for even these provisions, expressed in such plain English words, that it would seem the ingenuity of man could not evade them, are now, after the lapse of more than seventy years, sought to be avoided. Those great and good men foresaw that troublous

times would arise, when rulers and people would become restive under restraint,. and seek by sharp decisive measures to accomplish ends deemed just and proper; and that the principles of constitutional liberty would be in peril, unless established by irrepealable law. The history of the world had taught them that what was done in the past might be attempted in the future. *The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false;* for the government, within the Constitution, has all the powers granted to it, which are necessary to preserve its existence; as has been happily proved by the result of the great effort to throw off its just authority.'

''The same principle is stated by the supreme court of this state in the case of *State ex rel. Campbell* v. *Stewart,* 54 Mont. 504, 171 Pac. 755, 756, Ann. Cas. 1918D, 1101, in language equally vigorous. It will be noted, too, that this opinion was rendered on March 27, 1918, when we were engaged in world war, even as now. In that case, as in this one, the Constitution of this state was involved, and questions of great importance were raised, discussed, and ruled upon. Our court there said: '' ' * * * We likewise wish to disclaim any view that the Constitution of this state is in abeyance because the nation is at war, or that the Constitution is inadequate to serve the state at such a time, or that the exigency justifies or has called forth any canon of construction not applicable in a season of ''profoundest peace.'' Whatever is legally done by any public agency at any time must be done either with the sanction or without the inhibition of the Constitution; for, like the national charter, it ''is a law for rulers and people, equally in war and peace, and * * * no doctrine involving more pernicious consequences was ever

invented by the wit of man than that any of its provisions can be suspended" without its authority for any reason * * *.'. ·

"Thus, both the Supreme Court of the United States and the Supreme Court of this state have said that Chapter 47 must find justification, if at all, not in the fact that we are engaged in a war; but, rather, its provisions must find sanction either within the Constitution or that its provisions are without the inhibitions of the Constitution.

"Now let us analyze and compare the provisions of Chapter 47 with the applicable provisions of our Constitution. First an analysis of the statute.

"Chapter 47 applies to the office of Attorney General for that office is one 'other than a temporary position.' The Attorney General is 'in the employ of the State of Montana.' (Section 1, Chapter 47.)

"If the Attorney General enters the military service of the United States, as here, and 'receives a certification of completion of training for service from the proper authorities of the United States government, and is still qualified to perform the duties of such position * * * shall be restored to such position, status and pay at any time during the term for which he was elected.' (Paragraphs 1, 2 and (b) of Section 1, Chapter 47.) An elected officer who has entered the military service and who is later restored to his position 'shall be considered as having been on leave of absence during his period of active military service' (Section 5); and 'It is specifically declared that the absence of such officer, caused by such military service, *shall not create a vacancy in the office to which he was elected.'* (Section 8, Chapter 47.)

"Having ascertained what the provisions of the statute are, let us now direct our inquiry as to what may be done under the provisions of Chapter 47, *for it must be remembered that the test of the constitutionality of Chapter 47 is not alone what has been done under it but what may be done. (State et al. v. Board of Commissioners,* 89 Mont. 37 (see pages 63 and 64), 296 Pac. [6 and 7] and cases therein cited; *State v. Sunburst Refining*

*Co.,* 73 Mont. 68, 235 Pac. 428 (see pages 83 [and 431, respectively] and cases there cited) ; *Montana Co.* v. *St. Louis Mining & Milling Co.,* 152 U. S. 160 [14 S. Ct. 506] 38 L. Ed. 398.)

"What *has* been done under Chapter 47 is, to state the matter concretely, that Mr. Bonner has been absent from the state since May 1, 1942, is now absent from the state; he expects to be absent from the state for the remainder of this war, and that during none of the time since May 1, 1942, has he performed any of the duties of the office of Attorney General; neither does he expect to perform any of such duties until the termination of the present war.

"Some of the things which *may* be done under Chapter 47, stated concretely, are that Mr. Bonner, after qualifying for the office and entering upon the performance of the duties thereof on the first Monday of January, 1941, could, on the following day, have entered the military service of the United States, continued in such service until the end of his term or until the first Monday of January, 1945, *without having performed any part of the duties of that office during the entire term thereof excepting for the first* day of the term; and the person appointed as attorney general to take the place of Mr. Bonner would retain the office during all of the period of the absence of Mr. Bonner. In other words, the appointee would serve the entire term for which Mr. Bonner was elected, excepting the first day thereof.

"Certainly, if Mr. Bonner returned during the term for which he was elected and produced a certificate showing that his duties had been completed; that he was qualified to fill the office, and otherwise complied with the provisions of Chapter 47, he could reclaim the office; but even if he were discharged—even if he had completed the course of his training, or of his service, he may not be compelled to reclaim the office. *Whether he reclaims the office or not is optional with Mr. Bonner.*

"Under the provisions of Chapter 47, if Mr. Bonner had entered the military service on the Tuesday following the first Monday of January, 1941 and continued in that service until

the *first day of February, 1943,* then had returned with a certificate showing that he had completed his service; and although he be still qualified to fill the office, he need not reclaim it; and, therefore, by the provisions of Chapter 47, Mr. Bonner is vested with the power of determining who shall represent the people of this state in the office of Attorney General from February 1, 1943, for the remainder of the term for which he was elected; this because the defendant would in that case, continue to serve until the general election to be held in November, 1944, and until the defendant's successor was elected and qualified. That conclusion seems inescapable. If Mr. Bonner had returned on February 1, 1943, and made application to the Governor for reinstatement, showing therein compliance with the provisions of Chapter 47, and if the Governor had refused then to reinstate him; the chief executive may be compelled, by proceedings in a court of competent jurisdiction, so to do. (Section 6, Chapter 47).

''The foregoing by no means exhausts the many things which may be done under the provisions of Chapter 47, but the court will content itself with those and turn now to an analysis of the applicable provisions of our Constitution.

''Section 7 of Article VII of our Constitution, in so far as here material, provides: 'If the office of * * * Attorney General * * * shall be vacated by death, resignation or otherwise, it shall be the duty of the Governor to fill the same by appointment, and the appointee shall hold his office until his successor shall be elected and qualified.'

''It will be noted that the language used in section 7 is clear, plain, understandable, unambiguous. The framers of the Constitution were there dealing with: 1. A vacated office; 2. The causes which lead to a vacancy in that office or the manner in which such vacancy may be brought about; 3. The mode of filling the vacancy thus created and 4. The term or tenure of office of the person appointed to fill that vacancy.

''Our Supreme Court has said that applied to an office the word 'vacated' has no technical meaning. (*State ex rel. Cheno-*

*weth* v. *Acton,* 31 Mont. 37, 77 Pac. 299; *State ex rel. Lamey* v. *Mitchell,* 97 Mont. 252, 34 Pac. (2d) 369.)

"A search of the works of lexicographers, of law text book writers, of opinions of courts, for the purpose of gaining a clearer understanding of the meaning of the word 'vacated' is all in vain, for each of these say, in substance, that it means 'empty,' 'unoccupied'—and this we knew before the search.

"There is no such thing as a 'temporary' vacancy, for the supreme court of this state, in the case of [*State ex rel.*] *Patterson* v. *Lentz,* supra [50 Mont. 322, 146 Pac. 935], says: 'The Constitution does not distinguish vacancies into different classes on account of the exigencies which occasion them.'

"When a hole in a board has been described as being 'round and one inch in diameter,' any further use of words in an attempt to convey more clearly one's meaning is purposeless—an idle use of words. The same is true with the word 'vacated.' But if there were any question as to the meaning of the term 'vacated' in Section 7, Article VII (Const.), every vestige of doubt is dispelled when that word is considered in connection with the other provisions of our Constitution, as we shall presently see.

"Our Constitution must be considered as a whole, and effect given to every part of it. (*State ex rel. Palagi* v. *Regan,* 113 Mont. 343, 126 Pac. (2d) 818.) In the case of [*State ex rel.*] *Patterson* v. *Lentz,* supra, our court says: 'Effect must be given, if possible, to the whole instrument under consideration and to every section and clause of it.'

"The office of Attorney General was created (Const. Sec. 1, Art. VII). The means for the selection of the Attorney General was provided (Const. Sec. 2, Art. VII). The Attorney General is made a member of divers and sundry boards, among which are the board of pardons, the board of state prison commissioners, the board of land commissioners, the board of education, and the board of examiners. Imposed upon the Attorney General, and the other members of these boards, are divers and sundry duties, many of which are of grave importance. The nature of

these duties is such that their performance requires the actual physical presence of the members of these boards at the seat of government—hence the provision that the Attorney General shall, *during his term of office,* 'reside at the seat of government.' (Const. Sec. 1, Art. VII.)

"Thus the framers of the Constitution and the people of this state in adopting that Constitution, provided the office; that is, the shell. *The performance of the duties of the office is the kernel within the shell.* The officer is merely the instrument by which the performance of those duties is secured. The shell, plus the officer alone, are useless—lifeless. *It is the performance of the duties of the office which gives it life. The performance of the duties of the office is the very heart and soul of the whole thing. The office—plus the officer—plus the duties of the office —taken separately, are lifeless; but the officer, coupled with the performance of the duties of the office, gives life to the thing which the framers of the Constitution had in mind. The officer and the duties of that office are, therefore, inseparable; for when the officer ceases to perform the duties of the office, then the very purpose for which the office was created is defeated. When the officer ceases to perform the duties of the office that office is vacant.*

"Thus the clash between the provisions of Chapter 47 and the provisions of the Constitution becomes apparent, for Chapter 47 separates the duties of the office from the officer. By the provisions of Chapter 47 the officer—the Attorney General—may cease to perform any part of the duties of that office for an indefinite period—as much as three years and 364 days of a four year term, and yet he has not, according to Chapter 47, vacated that office. According to the provisions of Chapter 47, when the Attorney General has thus ceased to perform the duties of his office and upon his return and resumption of that office, his absence shall be considered as 'a leave of absence.' Thus Chapter 47 gives an entirely new and heretofore unheard meaning to the word 'vacated.' But, by the plain terms of Section 7,

Article VII (Const.), when the officer ceases to perform the duties of the office, then he has vacated the office.

"The framers of the Constitution and the people of the state in adopting it knew that death might overtake the occupant and that upon the happening of that event the deceased certainly would no longer be able *to perform the duties of the office;* and, therefore, the office would be vacated. They likewise recognized the right of the occupant to resign from the office, and they knew that if he did resign he would no longer *perform the duties of the office,* for he would then have severed all connection therewith, and again the office would be vacated. The framers of the Constitution likewise knew that the office might be vacated from many causes or by means or in a manner other than by death or resignation. To illustrate, the Constitution provides for the impeachment and trial of the Attorney General; and if he be convicted, that works a disqualification and results in a vacated office. (Const. Sec. 17, Art. V.)

"It is a matter of common knowledge that the office of Attorney General may be vacated *otherwise* than by death or resignation. It is not unreasonable to suppose that the framers of the Constitution had at least as much knowledge in that regard as is possessed by us now. It is impracticable, if not impossible, for any person or body of persons to anticipate the various causes which may result in a vacancy in that office. This the framers of the Constitution well knew, and, therefore, instead of attempting the impossible, the word 'otherwise' is used; that is, if the office shall be vacated from 'any other cause or causes' or 'in any other manner than by death or resignation.' That is the meaning ascribed to the word 'otherwise' by lexicographers. It is the meaning ascribed to it by the decisions of many courts, a few of which are here mentioned.

"In the case of *United States* v. *Fisher et al.* [2 Cranch 358, 385] 2 L. Ed. 304, the court had under consideration the construction of a statute reading, in part, as follows: 'And be it further enacted that when any revenue officer, or other person,

hereafter becoming indebted to the United States, by bond *or otherwise* shall' etc.

"The opinion was by Chief Justice John Marshall. He says: 'That these words, taken in their natural and usual sense, would embrace the case before the court, seems not to be controverted. "Any revenue officer, or other person, hereafter becoming indebted to the United States by bond or otherwise", is a description of persons, which, if neither explained nor restricted by other words or circumstances, would comprehend *every debtor of the public, however his debt might have been contracted.*'

"Applying the above to the language contained in Section 7, of Article VII—'vacated by death, resignation or otherwise,' there can be no doubt as to its meaning.

"It will be observed, too, that in our Section 7 there are no restrictive words used.

"In the case of *Territory* v. *Gutierrez*, 12 N. M. 254, 78 Pac. 139 [144], the court had under consideration a statute which provided that the governor shall fill all vacancies in county offices which 'shall occur by reason of *death, resignation* or otherwise.' It was there contended that the word 'otherwise' should not be construed as applying to certain vacancies, but that that word must be construed *ejusdem generis* with the particular things mentioned. The court, construing that language, says:

" 'The language of this Act discloses that the Legislature intended the word 'otherwise' to refer to vacancies occasioned otherwise than by death and resignation. Any other view would seem to make it absolutely meaningless, and this we cannot believe the Legislature intended. If the Legislature intended to limit the power of the Governor to fill vacancies to those occurring by death or resignation only, the word 'otherwise' would certainly not have been used. The Legislature no doubt had in mind that vacancies might occur in county offices otherwise than by death or resignation. A county officer might become a defaulter, abandon his office, and remove from the territory, but without tendering his resignation; or if as contended

by the appellees in this case his office became vacant by legislative enactment it would not be a vacancy created by death or resignation. Therefore the word 'otherwise' was added with the evident intention of making provision for the filling by the Governor of any vacancy occurring in the county offices of the territory from whatever cause other than that of death and resignation. Statutes should be construed according to the language used, and where the meaning of the language used is apparent there is no necessity for construction, but the Act should be given effect according to its terms. This question has been repeatedly before the courts of this country, and a reference to them makes it clear that the language used in this Act was used to extend the scope of the Act beyond the specific words used.'

"In case the office is vacated,

" 'It shall be the duty of the Governor to fill the same by appointment, and the appointee shall hold his office until his successor shall be elected and qualified.'

"The office being vacated, the Governor is commanded to fill that vacancy by appointment, but the Governor is forbidden to make an appointment unless there is a vacancy (Const. Sec. 29, Art. III). The person thus appointed shall hold office until the next general election. This provision is in keeping with our general scheme of government.

"We have the right to govern ourselves (Const. Sec. 2, Art. III). This we do through the election of our representatives. But when a vacancy occurs there is created an emergency. To meet the emergency it was deemed wiser to forego, for a short period of time, our right to select our own officers and to give that authority to the chief executive rather than to incur the expense of a special election. We fixed the term of office of the appointee so that at the *earliest opportunity* we could again elect our representative.

"In the case of *State ex rel. McGowan* v. *Sedgwick*, 46 Mont. 187, 127 Pac. 94 [95], our Supreme Court had under consideration the question whether a county commissioner appointed to

fill a vacancy would hold office for the remainder of the term of the person elected when that unexpired term extends beyond the first Monday in January next succeeding a general election. In that case the court reviewed generally the provisions of our Constitution in relation to vacancies in office, and also the term of office of the person appointed to fill a vacancy, and said:

"'A reference to the several provisions of the Constitution above discloses that in every instance of a vacancy in an elective office, where the vacancy is to be filled by appointment, the appointee shall hold *only* until the people who elected his *predecessor* have the first opportunity to fill the office *with a person of their own choice; and this rule is general, applies to every state,* district and county *office,* unless an exception is made in favor of one appointed to fill a vacancy in the office of county commissioner.'

"The court there held that although there was no express provision in the Constitution to the effect that a county commissioner appointed should hold office only until the next general election, nevertheless, by reason of the other provisions contained in the Constitution relating to the term of other officers, the same rule applied to county commissioners. In passing, it may be remarked that with the holding of our Supreme Court in that case in mind, where there was *no express provision* limiting the term of the appointee to the time of the next general election, how much more reason there is for enforcing the same rule where there is *an express provision* in our Constitution to that effect. In the case of *State ex rel. Patterson* v. *Lentz,* above, our Supreme Court laid down the rule:

"'The term for which the appointment holds good is governed by the limitations upon the appointing power therein (in the Constitution) prescribed.'

"Further, keeping in mind the general rule that all parts of a Constitution must be considered together, note again the language contained in our Constitution in reference to the length of term of the appointee. He 'shall hold his office until the next general election and until his *successor* is elected and qualified.'

Under Chapter 47, Mr. Bonner may succeed the defendant. By no stretch of the imagination can Mr. Bonner be the *successor* of the defendant, for Mr. Bonner is defendant's *predecessor* in office.''

By Chapter 47 the length of the term of the defendant is extended, for he may serve for the remainder of the term for which Mr. Bonner was elected; and thus the people of this state denied the right to govern themselves through the selection of their representative. Had Chapter 47 not been enacted, then upon Mr. Bonner entering the military service, the Governor would have appointed. That may not be denied. It is equally clear that then the defendant would have served until his successor qualified. Of that there can be no question. Thus Chapter 47, has, in effect, amended the Constitution.

'' In the *McGowan Case* above, the court says, further:

'' 'We think the court would be derelict in holding that merely by implication the people surrendered a right so valuable to them that they expressed their intention in plain and vigorous terms as to every other *elective officer by incorporating the limitations in the Constitution, thereby putting it out of the power of the Legislature even to effect a change.'*

''If the Supreme Court of this state considered that it 'would be derelict in holding that merely by *implication* the people surrendered a right so valuable,' how much greater would be the dereliction of this court were it to say that the people of this state had surrendered a right so valuable when there is an *express provision in the Constitution to the contrary.*

''Further, under the plain language of our Constitution this defendant had a right to this office from the time of his appointment (August 3, 1942) until 'the next general election and until his successor was elected and qualified.' But under the provisions of Chapter 47, if Mr. Bonner had returned on October 1, 1942, and showed a compliance with the provisions of Chapter 47, and demanded the office, then the defendant must be removed from the office and Mr. Bonner substituted in his place. Thus the defendant would be deprived of the office for a part

of the term for which, under the Constitution, he was appointed. Further, in that situation, if the Governor had refused to comply with the provisions of Chapter 47, Mr. Bonner may commence an action and procure an order compelling the Governor to comply with the provisions of Chapter 47. Thus, under the provisions of Chapter 47, *the courts of this state may be used for the purpose of compelling the chief executive of this state to violate the Constitution of this state by wrongfully removing the defendant from the office of attorney general and substituting Mr. Bonner.*

"The foregoing are but a few of the instances in which the provisions of Chapter 47 conflict with the applicable provisions of our Constitution.

"The construction herein placed upon the language contained in our Constitution finds abundant support in the decisions of our Supreme Court and that of most of the other courts of this nation. A few of these are as follows:

"In the case of *State ex rel. Rowe* v. *Kehoe,* 49 Mont. 582, 144 Pac. 162, 164, the court had under consideration Chapter 5, Laws of 1913. That statute provided, in substance, that an appointee to a county office shall hold his office until the first day of January 'next after a general election, and until his successor is elected and qualified.' The question presented was whether that statute conflicted with Section 5 of Article XVI (Const.), and speaking of the interpretation of the Constitution the court says:

" 'In the interpretation of Constitutions the cardinal rule to be observed is that words are presumed to have been employed in their natural, ordinary sense, and are to be so taken and understood unless the context in which they occur requires that they be assigned a different meaning, or other provisions on the same subject limit, qualify or enlarge their scope * * *. There is nothing in the context in which the expression in question appears in section 5 of article 16, supra, to indicate that the convention intended to use it in any sense other than that

expressed by it, as the ordinary person would understand it * * *.'

"And in commenting upon the application of this rule the court, in the same case said:

" '* * * So, too, the ordinary man on the street, in referring to the date of the general election, would mean, and would be understood to mean, the day of the month on which the election happens to occur, and not any other day.'

" '* * * It is not for the court to inquire what the purpose of the convention was in making different provisions for these different classes of offices, and by a process of construction undertake to declare that the convention intended to convey a meaning which its words do not express. When the courts have ascertained what the convention said and its language is clear and unambiguous and not limited or qualified in meaning by context or by other provisions on the same subject, the duty to interpret does not arise. The language is to be taken to mean what it says and nothing more, even though they may entertain the opinion that some other provision than the one under consideration would have been wiser.'

"Again, in the case of *Rider* v. *Cooney,* 94 Mont. 295, 23 Pac. (2d) 261, 264, the court had under consideration questions relating to the Constitution and therein says:

" 'In the interpretation of Constitutions the cardinal rule to be observed is that words are presumed to have been employed in their natural, ordinary sense, and are to be taken and understood in such sence, unless the context in which they occur requires that they be assigned a different meaning, or that other provisions on the same subject limit, qualify or enlarge their scope.'

"In the case of *State ex rel. Palagi* v. *Regan,* supra [113 Mont. 343, 126 Pac. (2d) 823], the court had under consideration the constitutionality of a statute, and therein says of the rules of construction applicable:

" 'Courts must first resort to the ordinary rules of grammar (*Jay* v. *School District,* 24 Mont. 219, 61 Pac. 250; *State ex rel.*

*Peck* v. *Anderson,* supra [92 Mont. 298, 13 Pac. (2d) 231]), in the absence of a clear contrary intention disclosed by the text must give effect to the legislative intent according to those rules (citing cases), and according to the natural and most obvious import of the language, without resorting to subtle and forced construction to limit or extend their operation (citing cases) and must first resort to the natural significance of the words employed in the order of grammatical arrangement in which they are placed, and if, thus regarded, they embody a definite meaning involving no absurdity or contradiction, the courts may not add to nor take away from their meaning. (*State ex rel. Hinz* v. *Moody,* 71 Mont. 473, 230 Pac. 575.')

"The Supreme Court of the United States, in the case of *Lake County* v. *Rollins,* 130 U. S. 662 [9 S. Ct. 651, 652], 32 L. Ed. 1060, speaking of the interpretation of constitutional provisions, says:

" 'If the words [of a constitutional provision] convey a definite meaning, which involves no absurdity, and no contradiction of other parts of the instrument, then that meaning, apparent on the face of the instrument, must be accepted.'

"For, says the court in the same case: 'Words are the common signs that mankind made use of to declare their intention to one another; and, when the words of a man express his meaning plainly, distinctly, and perfectly [there is] no occasion to have recourse to any other means of interpretation.'

"Again, in the case of *Hodges* v. *United States,* 203 U. S. 1 [27 S. Ct. 6, 8], 51 L. Ed. 65, the Supreme Court says:

" 'The [framers of the] Constitution, and the people who adopted it must be understood to have employed words in their natural sense, and to have intended what they said.'

"In the case of *Prigg* v. *Pennsylvania* [16 Pet. 539, 610] 10 L. Ed. 1060, in speaking of the construction to be given constitutional provisions, the court has this to say:

" 'And, perhaps, the safest rule of interpretation, after all, will be found to be to look to the nature and objects of the particular powers, duties and rights, with all the lights and aids

of contemporary history; and to give to the words of each just such operation and force, consistent with their legitimate meaning, as may fairly secure and attain the ends proposed. \* \* \*

"No court of justice *can be authorized so to construe any clause of the Constitution as to defeat its obvious ends, when another construction, equally accordant with the words and sense thereof, will enforce and protect them.* (Emphasis mine.)

"Applying these simple rules of construction to the words 'If the office \* \* \* shall be vacated by death, resignation or otherwise,' etc. can there be any doubt as to what was intended? Does not that language interpret itself? Taking these words in *'their natural, ordinary sense,'* would not *'the ordinary person,'* the 'man on the street' understand them to mean: 'If a vacancy shall occur by death, resignation, or from any other cause or in any other manner, the Governor shall appoint, etc?' Can there be any doubt what the *'ordinary person'* understands by the words 'the appointee shall hold office until the next election?'

"That little if any attention was paid to the provisions of our Constitution in the enactment of Chapter 47 is obvious, for its provisions are applicable to the members of the Supreme Court and to the office of district judge; that is, a Justice of the Supreme Court or a district judge, if he enters the military service, may absent himself from the state for an indefinite period of time—for one, two, three years or more, but shall not thereby vacate his office. But Section 37, Article VIII (Const.) provides:

" 'Any judicial officer who shall absent himself from the state for more than sixty consecutive days shall be deemed to have forfeited his office.'

"Can there be any question in the mind of any person, ordinary or *otherwise*, as to whether, in so far as it relates to Justices of the Supreme Court and district judges, Chapter 47 violates the provisions of Section 37, Article VIII?

"But there is in our Constitution itself a rule of construction which is decisive of this case. Section 29 of Article III (Const.) provides:

" 'The provisions of this Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise.'

"Thus the framers of the Constitution and the people of this state in adopting it said to the legislative department, to the executive department, and to the judicial department of our government that 'the language used in this Constitution means precisely what it says.'

"What is meant by the words 'unless by express words they are declared to be otherwise'? That may be illustrated by referring to a portion of Section 29 of Article VIII (Const.) which provides:

" 'Until otherwise provided by law, the salary of the Justices of the Supreme Court shall be four thousand dollars per annum each.'

"Eliminating the words 'Until otherwise provided by law,' the language is *mandatory* and *prohibitory*, and the legislature would not then be authorized to change that salary; but by the use of the words 'Until otherwise provided by law' there are *'express words'* by which the other language in Section 29 is not mandatory, neither is it prohibitory; that is, the legislature is not prohibited from changing the salary. By section 29, Article III, of the Constitution the legislature, as well as this court, is commanded to give to the language of the Constitution that meaning which the ordinary person attributes to it, and the legislature, as well as this court, is prohibited from adding to or taking from that Constitution in any wise or at all.

"The provision that 'the people of the state have the sole and exclusive right of governing themselves' (Sec. 2, Art. III, Const.), is mandatory and prohibitory.

"The provision that 'The officers of the executive department * * * shall during their terms of office reside at the seat of government' (Sec. 1, Art. VII), is mandatory and prohibitory.

"The provision in relation to the time of the election of the Attorney General in section 2, Article VII, is mandatory and prohibitory; and the last clause of section 7, Article VII, 'If the

office of * * * Attorney General * * * shall be vacated by death, resignation or otherwise, it shall be the duty of the Governor to fill the same by appointment, and the appointee shall hold his office until his successor shall be elected and qualified,' is mandatory and prohibitory.

"Neither the legislature nor this court may take from or add to any of these provisions. Therefore, neither the legislature nor this court may say that by the word 'otherwise' the framers of the Constitution or the people in adopting it intended to leave to the legislature the right to say when a vacancy in offices is created other than by death or resignation. To do that constitutes a clear violation of section 29, Article III, above.

"The Supreme Court of this state, during a period of half a century has had this provision of our Constitution before it upon many occasions, and in all of those decisions, save one, has held that this provision means exactly what it says:

"This provision first came before our Supreme Court in 1894 in the case of *State* v. *Tooker,* 15 Mont. 8, 37 Pac. 840, 842, 25 L. R. A. 560. There the question presented had to do with an amendment to our Constitution and whether the notice given thereof was in compliance with the Constitution. Therein our Supreme Court quoted with approval language from other courts, as follows:

" '*We can conceive of no greater danger to constitutional government, and to the rights and liberties of the people, than the doctrine which permits a loose, latitudinous, discretionary construction of the organic law.* "We are taught by the Constitution itself that those who administer this government are divided into three coordinate departments; each of these can only act within its own limited sphere, and they, respectively, are the servants of the sovereign power, the people. There is no power above the people. There is no discretionary power granted in the Constitution for either of these departments, nor for all of them united, to exercise a discretionary expansion and flexible power against its rigid limitations, even though such limitations were imposed by improvident jealousy. If abuse

exists by reason of defects in the Constitution, present or prospective, the true source of authority, the people, have the power, and doubtless the wisdom and patriotism, to correct them; *and this, in the American idea, is the safe and only depostory.*" '

"Continuing, our Supreme Court says:

" 'It would seem that the framers of our Constitution had in mind the views of Judge Cooley, for they did not leave the language of the Constitution open to the construction of courts, but set the matter at rest by the following provision: "The provisions of this Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise." (Const. Art. III, sec. 29.) The court is therefore relieved from much responsibility in the construction of the organic law. * * * The Constitution construes itself in this regard.'

"In the same case the Supreme Court quotes with approval from an Alabama case [*Collier* v. *Frierson,* 24 Ala. 100], as follows:

" 'But to what purpose are these acts required, or these requisitions enjoined, if the legislature, or any other department of the government, can dispense with them? To do so would be to violate the instrument which they are sworn to support, and every principle of public law and sound constitutional policy requires the courts to pronounce against every amendment which is shown not to have been made in accordance with the rules prescribed by the fundamental law.'

"In the case of *In re Weston,* 28 Mont. 207, 72 Pac. 512 [514], our Supreme Court had under consideration section 12 of Article VIII (Const.) which empowers a district judge to call in another district judge to try a cause. The Eighth Legislative Assembly of Montana enacted a statute giving that authority to the Supreme Court of the state. Our Supreme Court held that legislative Act null and void, saying:

" '* * * The general rule, repeatedly affirmed and now well understood, that the Constitution of the United States represents a grant of power by the several states and the inhabitants thereof to the general government, while the Constitutions of the sev-

eral states operate upon the law making branches of those governments as limitations of authority, must be understood and considered in this connection with the qualification which our own state Constitution has attached, that "the provisions of this Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise." (Section 29, Article III, Constitution of Montana.) This declaration can have but one meaning—that, with reference to those subjects upon which the Constitution assumes to speak, its declarations shall be conclusive upon the Legislature, and shall prevent the enactment of any law which has for its purpose the extension or limitation of the powers which they confer. * * *'

" '(2)   It cannot be seriously contended that the purpose of the Act was to provide a mode of substitution in addition to the one prescribed by the Constitution. This, clearly, cannot be done; * * *.'

"In the case of *State* v. *State Board of Equalization,* 56 Mont. 413, 185 Pac. 708 [711, 186 P. 697], our Supreme Court had under consideration section 16, Article XII, (Const.) as it related to the power to assess railroads and railroad property. By that section of the Constitution this authority is vested in the State Board of Equalization by express language. The Supreme Court there said:

" '* * * The provisions of that section (sec. 16, Art. XII) are mandatory and prohibitory, in the sense that the Legislature cannot take from the State Board of Equalization the power to assess railroad property *nor vest such power elsewhere.*

" 'The maxim, *expressio unius est exclusio alterius,* invoked by respondents, is a rule of interpretation, and not a constitutional command, and cannot be made to serve as a means to restrict the plenary power of the Legislature, nor to control an express provision of the Constitution.'

"But if the maxim *'expressio unius est exclusio alterius'* cannot be made to serve 'as a means of restricting the plenary power of the legislature, nor to control an express provision of

the Constitution,' does not the same rule apply to '*ejusdem generis?*'

"In the case of *Vaughn & Ragsdale Co.* v. *State Board,* 109 Mont. 52, 96 Pac. (2d) 420, 424, the matter before the court was whether section 20, Article V (Const.) required that the enacting clause of every bill passed by the legislature run in the name of the Legislative Assembly of the State of Montana. The court said:

" 'We think the provisions of the Constitution are so plainly and clearly expressed and are so entirely free from ambiguity that there can be no substantial ground for any other conclusion than that Chapter 199 was not enacted in accordance with the mandatory provisions of that instrument, and that the Act must be declared invalid. It is unfortunate that the legislature failed to follow the mandatory requirements laid down by the people in the Constitution, but the courts have no more authority to overrule the people in that respect than has the legislature.'

"In *State ex rel. Palagi* v. *Regan,* supra, the question presented was whether the relator whose election to a public office had been annulled because of a violation of the Corrupt Practices Act could become a candidate for office again during the term for which he had been removed. Section 10807, R. C. M. 1935, provided that he could not become such candidate within that time. Section 11, Article IX (Const.) is:

" '* * * any person qualified to vote at general elections and for state officers in this state, shall be eligible to any office therein except as otherwise provided in this constitution, * * *.'

"There the court said:

" 'The provisions of the state Constitution are "mandatory and prohibitory, unless by express words they are declared to be otherwise", (Article III, sec. 29), and they are conclusive upon the legislative authority and prevent the enactment of any law which extinguishes or limits powers conferred by the Constitution. * * *

" 'However, concluding as we do that the statute is not am-

biguous, it is not possible to adopt an alternative construction for the purpose of avoiding unconstitutionality * * *.'

"In that same case our court used the language hereinafter quoted, which is squarely in point, in the case now under consideration, as follows:

" '* * * But the question is whether, in addition, a disqualification not included in the Constitution can be added, even for the laudable and constitutional purpose of purifying elections.'

"Canons of construction such as 'ejusdem generis' have no place in a case such as this where the language under consideration is plain, clear, certain, unambiguous. As was said by the Supreme Court of the United States in the case of *Mid-northern Hotel Co.* v. *Walker*, 268 U. S. 45, 45 S. Ct. 440, 441, 69 L. Ed. 841:

" 'The doctrine (*ejusdem generis*) invoked is a rule of construction, to be used as an aid in the ascertainment of the intention of the lawmakers, *and not for the purpose of subverting such intention when ascertained.*'

"For the reasons hereinbefore stated, this court is of the opinion that Chapter 47, Laws of 1941, is unconstitutional and void for that it violates, among others, the following provisions of our Constitution: Section 2 of Article III, section 29 of Article III, sections 1 and 2 of Article VII, section 7 of Article VII.

"This court is of the opinion that the term of office for which the defendant was appointed has expired; that the cross-complaint ought to be dismissed, and that the defendant should take nothing by this action.

"*Findings of Fact Number X.*

"That the Supreme Court of this state, in the case of *Gullickson* v. *Mitchell*, 113 Mont. 359, 126 Pac. (2d) 1106, decided that Chapter 47, Laws of 1941, does not violate the provisions of the Constitution of this state, and the facts in the case at bar are the same as the facts in the *Gullickson Case.*

"*Conclusion of Law Number III:*

"That this court has concluded that Chapter 47, Laws of 1941, conflicts with the provisions of the Constitution of this

state and is, therefore, void; that the term for which the defendant was appointed has expired; that the defendant's cross-complaint should be dismissed and that the defendant should take nothing by this action; but the Supreme Court having decided that Chapter 47 is constitutional, that that decision, so long as it shall remain unchanged, is binding upon this court; that by reason of the decision of the Supreme Court in the *Gullickson Case,* and solely because of that decision, this court concludes, and judgment shall be rendered and entered therein, adjudging that the defendant is the duly appointed, qualified and acting Attorney General of this state; that he is entitled to continue as such Attorney General until the general election in November, 1944, and until his successor shall be elected and qualified, unless John W. Bonner shall reclaim that office as provided by Chapter 47, Laws of 1941; and that defendant recover his costs of suit herein incurred.

"Done in chambers at Glendive, Montana, this 9th day of March, A. D., 1943.

"Frank P. Leiper
"Presiding Judge.

"(Filed March 10, 1943)"

I deem it well to say that I impute no blame to the estimable gentleman who now occupies the office of Attorney General. A majority of this court sustains his claim of right to the office.