No. 15,706.

HANEBUTH, CHIEF OF POLICE ET AL.
*v.* PATTON.
(170 P. [2d] 526)

Decided June 10, 1946.

Mr. MALCOLM LINDSEY, Mr. FRANK L. HAYS, for plaintiffs in error.

Mr. BYRON G. ROGERS, Mr. FRANK A. BRUNO, for defendant in error.

*En Banc.*

MR. CHIEF JUSTICE KNOUS delivered the opinion of the court.

IN a remedial proceeding initiated by defendant in error in the district court under the provisions of Rule 106(a)(4) R.C.P. Colo., plaintiffs in error, contrary to their previous administrative action, were ordered to reinstate defendant in error to his former position as patrolman of the first grade in the classified civil service of the police department of the City and County of Denver. Herein plaintiffs in error seek a reversal of that adjudication. For convenience we shall refer to plaintiffs in error as such or by their respective official titles, and to defendant in error as plaintiff.

In September, 1942, the United States Navy Recruiting Station at Denver received instructions to interview and give physical examinations to qualified police officers with a view to enlisting them for active duty with a shore patrol detail. Among the eighty-odd peace officers responding to this call was plaintiff, then an active member of the Denver police force with the civil service classification above given. September 18, 1942, he decided to volunteer for enlistment in the United States Naval Reserve and applied for a special rating in the detail above mentioned. Following an interview and examination he was one of the comparatively few accepted by the navy, and, January 23, 1943, was sworn

in in that branch of the armed forces of the United States, with the rating of petty officer, first class. January 28, 1943, plaintiff applied to the Manager of Safety and Excise for a leave of absence from the police force for the duration of the war. Pursuant to his orders from the navy, plaintiff reported for duty February 1, 1943, and actually served in that branch of the service until he was honorably discharged August 27, 1945. February 2, 1943, the Manager of Safety and Excise denied plaintiff's request for a leave of absence and this action was approved by the Civil Service Commission three days later. March 29, 1943, by formal complaint to the Manager of Safety and Excise, the Chief of Police charged that plaintiff's absence from duty in the police department amounted to a constructive resignation therefrom under section 24, Rule 17 of the rules and regulations of the department, which, in so far as is pertinent herein, specifies, that: "Absence without leave, or a legitimate excuse, for a period of five days, shall be construed as constructive resignation as provided in the Civil Service Rules." Hearing thereon was set for April 15, 1943. However, before the arrival of that date plaintiff, claiming the benefit of the Sailor's and Soldier's Civil Relief Act of 1940, section 201, U.S.C.A. Appendix section 521, sought and procured an injunction in the district court enjoining the Chief of Police and the Manager of Safety from proceeding with the hearing pending plaintiff's return to a civilian status. In the case reported as *Hanebuth v. Patton,* 111 Colo. 447, 142 P. (2d) 1010, we reversed that judgment for the reasons stated in the opinion in the companion case of *Hanebuth v. Scott,* 111 Colo. 443, 142 P. (2d) 1008. Thereafter plaintiff filed an answer to the charges preferred with the Manager of Safety and Excise, offering his engagement in the armed forces of the United States as an excuse for his absence from the police force and protested that the requested severance from his position and civil service status therein on the grounds asserted,

would be unjust, arbitrary and contrary to public policy, as well as discriminatory, in that leaves of absence had been, and were being granted to others in similar situations. The matter came on for hearing before the Manager of Safety and Excise on February 10, 1944, who held that plaintiff's absence from duty as a patrolman should be construed "to be a constructive resignation from the classified service of the police department, effective as of the date of the filing of the original specification and complaint." Plaintiff was not present at the hearing, navy leave therefor having been denied, because:

"1. Due to your recent transfer in duties to San Francisco Shore Patrol and the *alert* status of all personnel subject to transfer to the jurisdiction of the Pacific Fleet it will be impossible for you to be granted leave to return to Denver, Colorado.

"2. Service Force, Subordinate Company, Pacific Fleet, is now calling for trained police specialists for duty at fleet bases in the Pacific area. Inasmuch as you have been found eligible for such assignment, with the knowledge that 16 of our complement were transferred during the past month, you can readily understand why it is impossible to grant your request."

Upon the review requested by plaintiff's counsel, the Civil Service Commission upheld the decision of the Manager of Safety and Excise. Following his honorable discharge from the navy in the fall of 1945, plaintiff asked for reinstatement in the police department, and upon being denied such, instituted the proceeding at bar wherein, as we have said, the district court ordered that plaintiff's position and civil service status in the police department be restored to him.

In an action of this nature (under Rule 106[a] [4]), judicial "review shall not be extended further than to determine whether the inferior tribunal has exceeded its jurisdiction or abused its discretion." That the Manager of Safety and Excise and the Civil Service Com-

mission had jurisdiction in the controversy was stressed in our opinion in *Hanebuth v. Scott, supra,* and such is not questioned herein by plaintiff. Hence, the sole question for consideration is whether the official agencies in concern abused their discretion in refusing to accept plaintiff's service in the armed forces as a "legitimate excuse" under section 24, Rule 17, supra, for his absence from duty in the police department.

In adjudging the question the following incidents, in addition to those hereinabove detailed, are to be considered. At and previous to the time plaintiff applied for enlistment and rating in the navy, the Chief of Police, with the tacit concurrence of the Manager of Safety and the Civil Service Commission, followed the uniform procedure of granting indefinite leaves of absence to all persons in the classified service of the police department who entered the armed forces, whether by voluntary enlistment or by induction through the processes of the Selective Service Act. However, late in October, 1942, the commission changed the previous practice by promulgating that: "Leaves to those members of the Department above draft age, or to those of draft age in no immediate danger of being selected under the Selective Service System, to be discouraged," and, that: "Every consideration be given the request of those men of draft age, about to be selected, who can, by enlistment, secure work more closely related to their work on the department, or work which will, upon their return, make them a better member of the Department, or work more to their liking and abilities and in which they can render a greater service to their country, and, thus, to the city."

As administered, this new policy of "discouragement" of leaves of absence took the form of perfunctory denials of such to those members of the department, who, although not in "immediate danger" of induction, nevertheless wished to volunteer for wartime service in the armed forces of their country. However, and at the

same time, the commission sanctioned the automatic granting of leaves of absence to others, who, by the accident of their ages, were drafted, or who in the imminence of such, elected to enlist in the branch of the armed services most attractive to them. Although registered in compliance with the Selective Service Act and subject to its provisions, plaintiff, because he was 47 years old, was deemed by the civil service agencies to be within the category banned leaves of absence under the revised system. As appears from the record, this change in policy was induced by the anxiety of the heads of the police department over the possibility that its functioning might be jeopardized through the reduction of its force occasioned by a continued filtration of its personnel into the military services and the latter's coincident absorption of the reservoir of manpower normally available for the recruitment of policemen. Notwithstanding this apprehension on the part of the Civil Service Commission and its agencies, it seems timely to note that, in so far as we are advised, under the regulations of the selective service authority, employment on a municipal police force per se never was accepted as a ground for the deferment of induction into military service. Viewed retrospectively, as now may be done, experience has not demonstrated the unwisdom of the latter view.

The national policy in this field was declared by the Congress in the Selective Training and Service Act of 1940, 50 U.S.C.A. App., sections 301-318. That act not only prescribed procedures for the selection, training and service of individual citizens of the United States in the armed forces, but also made provisions for the return to their previous civilian pursuits. Concerning the latter aspect, section 8(b) (Selective Service Act, 1940), 50 U.S.C.A., appendix, section 308(b), specifies:

"(b) In the case of any such person who, in order to perform such training and service, has left or leaves a position, other than a temporary position, in the employ

of any employer and who (1) receives such certificate [of satisfactory completion of his period of * * * service], (2) is still qualified to perform the duties of such position, and (3) makes application for reemployment within forty days after he is relieved from * * * service * * * (A) if such position was in the employ of the United States * * *, such person shall be restored to such position ·or to a position of like seniority, status and pay; (B) if such position was in the employ. of a private employer, such employer shall restore such person to such position or to a ·position of like seniority, status and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so; (C) *if such position was in the employ of any State or political subdivision thereof, it is hereby declared to be the sense of the Congress that such person should be restored to such position or to a position of like seniority, status and pay.*"

By the Service Extension Act of 1941, 50 U.S.C.A. Appendix, sections 351-362, Congress enacted (§357) that: "Any person who, subsequent to May 1, 1940, * * * shall have entered· upon active military or naval·service in the land or naval forces of the United States shall be entitled to all of the reemployment benefits of section 8 of the Selective Training and Service Act of 1940 * * * *to the same extent as in the case of persons inducted under said act. * * * *"

Thus with respect to job security for returning service personnel, Congress, in 1941, erased all distinctions, if any such ever existed, between the situations of volunteers and draftees, and placed both on precisely the same footing. Notwithstanding that subdivision (C), section 8(b), supra, relating to the reemployment of employees of "any state or political subdivision thereof," for understandable reasons, is couched in a. directory tone rather than in the mandatory form of (A) and (B), the public policy proclaimed by the congressional acts is unequivocal. It was to promote the recruiting and

expansion of the military forces of the United States, traditionally a citizens' army, by so-called "voluntary enlistments" as well as through the operation of the Selective Service Act. See, *People ex rel. v. Sischo,* 23 Cal. (2d) 478, 144 P. (2d) 785.

In positive and direct opposition to such objective was the 1942 policy of the Civil Service Commission and its resulting adjudication in absentia against plaintiff, which, even though conceived and made in a good-faith effort to husband the dwindling manpower of the police force, nonetheless, made the permanent forfeiture of his civilian job, seniority and civil service status, the price of voluntary enlistment in the armed forces of his country for a policeman "in no immediate danger" of being drafted.

"Whatever tends to lessen the willingness of citizens to discharge their duty to bear arms in the country's defense detracts from the strength and safety of the Government." *United States v. MacIntosh,* 283 U.S. 605, 51 Sup. Ct. 570, 75 L. Ed. 1302, 1308.

Further, by preserving the job and civil service status of those who were drafted, or about to be, through automatically granted leaves of absence from the police department, while denying such to volunteers not in that category, the civil service procedure disregarded a public policy intended to guarantee the same reemployment privileges to draftee and volunteer alike, and so in effect, discriminated against the latter.

By way of contrast, it is of interest to observe that in acting to protect the civil service status of employees of the State of Colorado, including those in its law enforcement agencies, during periods of engagement in the armed forces of the United States, our General Assembly, in harmony with the congressional policy, extended equal protection to all who entered such, whether by "enlistment or induction." S.L. '41, c. 95; S.L. '45, c. 96.

In a similar spirit of patriotism, at the 1944 general election, the people of Colorado, through an initiated petition (256,563 votes "Yes" to 107,100 votes "No"), adopted a constitutional amendment granting grade preferences in civil service examinations in state, counties, cities and towns, including those chartered under the Twentieth Amendment, to veterans "who served in the armed forces of the United States in times of war," without expressing any distinction whatsoever between those who enlisted and those who were drafted. S.L. '45, p. 265.

No less than arbitrary, it seems to us, was the refusal to restore plaintiff to his civilian position and status, as promptly was requested by him following his separation from the navy. By that time the sources of the misgivings which had motivated the 1942 policy of the Civil Service Commission had vanished. Notwithstanding, there still were vacancies in plaintiff's grade and rank in the police department. Oft cited Rule 17, supra, clearly does not contemplate that an absence of five days without leave, ipso facto and alone, effects a "constructive resignation" from the police department; such transpires only when the absentee is without a "legitimate excuse." As such, plaintiff offered his honorable discharge from a military arm of the United States, showing wartime service therein for a period coincident with his absence from the police force. This, considered in the light of the matters of public policy hereinabove mentioned, in our opinion, furnished a most adequate excuse. In effect, the refusal to permit plaintiff to resume his duties on the force approximated a discharge therefrom. That such was the forthright view of the Chief of Police was made clear by his answer that plaintiff was "fired" when the latter asked for assignment to duty. That a refusal to accept a legitimate excuse for absence without leave, has the legal aspects of a discharge is indicated by our opinion in *Hanebuth v. Scott, supra,* wherein we said, if the policeman's "ab-

sence was not justified by his military service it was a constructive resignation under section 24 of rule 17 of the Rules of the Police Department, and if discharged he had an appeal to the Civil Service Commission under section 238 of the Denver Charter." By said section 238, discharges are limited solely to causes which "will promote the efficiency of the service." May it be said reasonably, that the restoring of an honorably discharged war veteran to his old position on the police force would detract from its efficiency?

While, as might be anticipated from the diversity in rules and statutes, no authority precisely in point has been called to our attention, and we have discovered none in our search; however, appellate courts generally, expressing views of the public policy consistent with ours, have adjudicated in even tenor to protect the civilian job statuses of war veterans. Typical of these decisions are *People ex rel. v. Sischo, supra; Baker v. Dixon,* 295 Ky. 279, 174 S.W. (2d) 410; *State ex rel. v. Bottomly,* 116 Mont. 96, 148 P. (2d) 545; *State ex rel. v. Wysong,* 125 W. Va. 369, 24 S.E. (2d) 463; *Carpenter v. Sheppard,* 135 Tex. 413, 145 S.W. (2d) 562, 312 U.S. 697, 61 Sup. Ct. 734, 85 L. Ed. 1132; *Critchlow v. Monson,* 102 Utah 378, 131 P. (2d) 794; and *Reppucci v. Board,* 130 N.J.L. 22, 31 Atl. (2d) 215. For statements of the public policy relating to the duty of citizens to render military service in times of national need, see, *United States v. MacIntosh, supra,* and *Arver v. United States,* 245 U.S. 366, 38 Sup. Ct. 159, 62 L.Ed. 349, L.R.A. 1918C 361, Ann. Cases 1918B 856.

The judgment is affirmed.